UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:21-00138 (WOB-CJS)

G.T., a minor child,
by and through his next
friend and parent, A.T.,
ET AL.,                                                      PLAINTIFF,

VS.                 MEMORANDUM OPINION AND ORDER

CAMPBELL COUNTY BOARD
OF EDUCATION, ET AL.,
                                                            DEFENDANTS.

Before the Court are the parties' cross-motions for Judgment on the Record. (Doc. 22; Doc. 27). The issues are fully briefed and the motions are ripe. The Court now issues this Memorandum Opinion and Order.

*Factual and Procedural Background*

**A. Overview of G.T.'s disability and education**

G.T. is a fourteen-year-old child with Down Syndrome. (Doc. 22 at 3; Doc. 20-1 at 3). In 2014, a school-conducted multidisciplinary evaluation concluded that he was severely disabled and that his language, communication, socialization, and daily living skills were impaired. (Doc. 20-1 at 244). In 2017, a Cincinnati Children's Hospital evaluation found that G.T. scored below the 1st percentile in articulation. (*Id.*). In 2018, another evaluation concluded that G.T.'s non-verbal IQ, communication,

daily living skills, and motor skills were all below the 1st percentile. (*Id.*).

From 2014 through 2021, G.T. was enrolled in the Campbell County School District. (Doc. 22 at 3; Doc. 27 at 7). He began kindergarten at Grant's Lick Elementary School, then spent a year at Campbell Ridge Elementary School, then returned to Grant's Lick, where he remained. (*Id.* at 243).

G.T. qualifies for special education as a "functionally mentally disabled," or FMD, student. (*Id.*). Until schooling became virtual during COVID, G.T. was educated partially in FMD classrooms. (*Id.*). FMD classrooms have smaller class sizes and include a special education teacher and three paraeducators. (*Id.* at 243-44).

G.T.'s education has always been under the purview of an Individual Education Program, or IEP. (Doc. 27-1 at 4). An IEP is a unique, individualized education plan created for disabled students by the student's "IEP Team"—teachers, school officials, and the child's parents. It includes a statement of the child's current academic and functional performance; measurable annual goals; metrics for measurement; a description of the special education, supplementary aids, and related services the child will receive; an explanation of the extent to which the child will not participate in regular classrooms with non-disabled children; and

a statement of any individual accommodations. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(VI).

### B. G.T.'s time was split between general education classrooms and special education classrooms

G.T.'s IEPs specified that G.T. would spend 40-80% of his time in general education classrooms. (Doc. 27-1 at 4; Doc. 20-1 at 246). But the amount of time he spent in special education classrooms increased over time:

| IEP Date | Percentage of Time Specified for General Education Classrooms | Amount of Time Specified for Special Education Classrooms |
|---|---|---|
| 2015-2016 | 40-80% | 140 minutes/day |
| March 24, 2016 | 40-80% | 200 minutes/day |
| February 10, 2017 | 40-80% | 200 minutes/day |
| September 29, 2017 | 40-80% | 120 minutes/day + 225 minutes/week |
| February 6, 2018 | 40-80% | 120 minutes/day + 225 minutes/week |
| February 15, 2019 | 40-80% | 120 minutes/day + 225 minutes/week |
| January 29, 2020 | 40-80% | 120 minutes/day + 225 minutes/week |

The school district maintained that the increase in time spent in special education classrooms was due to G.T.'s functional needs. (Doc. 20-1 at 246). According to Campbell County School District Director of Special Education Marinell Kephart, it became inefficient to educate G.T. in the general classroom because the distractions inherent in those classes made it difficult for G.T.

3

to participate. (*Id.*). Special education teacher Maria Stellar corroborated this: "We tried every day, but sometimes he would get to the door and just a bit overwhelmed [sic]." (Doc. 20-1 at 247).

G.T.'s parents believed otherwise. Based on G.T.'s IEP, which stated that G.T.'s behavior impeded his learning, G.T.'s parents believed his exclusion from general classrooms stemmed from behavior issues occurring during the transitions from the special education classrooms to the general education classrooms. (*Id.*). In 2017 they requested a functional behavior assessment. (*Id.*). The assessment showed that G.T.'s difficulties transitioning between special and general classrooms stemmed from the noise and distractions of the general rooms. (*Id.*). It concluded that 83% of the time G.T. had no behavior issues with transitioning. (*Id.*; Doc. 27-1 at 6). Accordingly, the school declined to implement a behavior intervention plan. (Doc. 27-1 at 6).

**C. The paraeducator assigned to G.T.**

From 2015 through 2019, G.T. was accompanied by paraeducator Leslie Younce. Younce has not taken the Kentucky paraeducator exam or been certified as a paraeducator. (*Id.*). She studied nursing in college. (*Id.*). Her only education training was what the school provided her when she was hired. (*Id.* at 7). Younce, without the aid of a special education teacher, modified and adapted the work given to G.T. in the general classroom setting and decided if and when G.T. would be placed in that setting. (*Id.* at 7).

4

G.T.'s IEPs list the special education teacher, not a paraeducator, as the person designated to provide those services. (Doc. 20-1 at 255). But it is unclear whether the special education teacher must be physically present with G.T. and whether the paraeducator may adapt learning materials under the special education teacher's supervision. (*Id.*). The school principal testified that, were he to observe G.T. in the general classroom, he would have seen "a paraeducator *or* the special education teacher." (*Id.*). On the other hand, the Director of Special Education testified that "it has to be a special ed teacher" who provides special education in a general classroom setting. (*Id.*).

**D. The Edmark reading program**

Sometime during or before the 2018–2019 school year, G.T.'s mother requested planning sessions to discuss improving G.T.'s reading skills. (Doc. 22 at 7). The school district's special education instructional coach conducted planning sessions with G.T.'s special education teacher. (Doc. 20-1 at 259). By January 10, 2019, they had settled on the Edmark reading program. (*Id.*). G.T.'s IEP did not require any particular program. (Doc. 27-1 at 9).

On February 27, 2019, G.T.'s special education teacher emailed the instructional coach, saying that she did not understand how to use the Edmark program and requesting a meeting to obtain guidance. (Doc. 20-1 at 259). The instructional coach responded

5

the same day, telling the teacher that they could meet to discuss the Edmark materials. (*Id.*).

On March 4, 2019, the instructional coach emailed the special education teacher and the principal, telling them that the Edmark materials were in the teacher's room and that they had set aside time that week to work on an assessment and on adapting the materials to fit G.T.'s needs. (*Id.* at 260).

Two days later the instructional coach discovered that, contrary to her previous email, the school did not have the Edmark materials. (*Id.*). She arranged to have the materials purchased. (*Id.*).

On March 29, 2019, the instructional coach requested time for the special education teacher to observe another teacher using the Edmark materials. (*Id.*).

On April 17, 2019, the instructional coach met with the special education teacher to prepare her to conduct the assessment needed to adapt the program to G.T.'s needs. (*Id.*). But the instructional coach does not know whether the teacher ever conducted the assessment. (*Id.*).

In May, at the end of the school year, the special education teacher resigned. (*Id.*).

In August, at the beginning of the new school year, the new special education teacher found the Edmark materials at the school, still wrapped in cellophane. (Doc. 22 at 7). The Edmark program

6

was implemented that year. (*Id.*). G.T. performed well and made substantial progress. (*Id.*; Doc. 20-1 at 261).

### E. Data collection

The school collected data to assess G.T.'s academic progress. (Doc. 20-1 at 256.). The special education teacher would record the data manually, store it in binders, and eventually enter it into a program that converted the data into a progress report. (*Id.*; Doc. 27-1 at 8).

On May 17, 2019, G.T.'s mother went to the school and asked for progress data. (Doc. 20-1 at 256; Doc. 27-1 at 8). The special education teacher provided the progress report, but data from April and May were missing. (Doc. 20-1 at 256; Doc. 27-1 at 8). When asked to explain, the teacher said she had not yet entered the data. (Doc. 20-1 at 256; Doc. 27-1 at 8). The April and May data was eventually entered and provided to G.T.'s mother. (Doc. 20-1 at 257; Doc. 27-1 at 8). There was also evidence that, as far back as 2015, data had been entered on dates when G.T. was not at school. (Doc. 20-1 at 257).

The school district offered two explanations for the discrepancies. First, it was common for teachers to collect data when they interacted with students, but not enter that data until sometime later, when they had time (e.g., collecting data the week before spring break and then entering the data during spring break, when the students were gone). (*Id.*). Second, the program used to

7

enter data defaulted to the date of data entry, and had to be manually adjusted to reflect the date when the data was collected. (Doc. 27-1 at 8). Sometimes teachers forgot to make the adjustment. (Doc. 27 at 10).

### F. G.T.'s iPad

During the 2018–2019 school year, G.T. and his sister, N.T., had the same homeroom at school. (Doc. 20-1 at 261; Doc. 27-1 at 10). N.T. testified that when G.T. was not working with the special education teacher, he was usually watching cartoons on his iPad. (Doc. 20-1 at 261; Doc. 27-1 at 10).

G.T.'s mother became suspicious about what G.T. was doing during the school day. (Doc. 20-1 at 262). She set a time limit on the iPad that limited access to videos and YouTube to three hours per day, and she began recording G.T.'s iPad use by taking screenshots of the data. (*Id.*). She also discovered that G.T. was taking pictures of himself, other students, and school staff; that some of the pictures had been deleted, but not by her; that it appeared that someone at the school had tried to override the time limit on videos and YouTube; and that school staff had deleted the iPad's browsing history on March 13. (*Id.*). After creating a record of the iPad's use from March 5 to May 15, she told the principal that G.T. would no longer bring the iPad to school. (*Id.*; Doc. 27-1 at 10).

The Hearing Officer determined, and the Appeals Board affirmed, that on twenty-two days from March through May of 2019, G.T.'s iPad use during school hours was so excessive that he did not receive any meaningful instruction during that time. (Doc. 20-1 at 263, 364-67).

**G. Procedural History**

G.T. and his parents requested a due process hearing in August 2019. (Doc. 20-1 at 3). Later that month the Kentucky Department of Education issued a Notice of IDEA Due Process Hearing and assigned a Hearing Officer to the case. (*Id.* at 6). The parties elected to mediate and the Hearing Officer suspended all deadlines pending the mediation outcome. (*Id.* at 13). The mediation was unsuccessful and the Hearing Officer set the hearing for April 16-17 and May 7-8, 2020. (*Id.* at 20).

After a series of delays and status reports due to COVID, and after the parties completed discovery, the Campbell County School District moved for Partial Summary Judgment. (*Id.* at 53). It argued that some of G.T.'s claims were barred by the statute of limitations. (*Id.*). After briefing, the Hearing Officer barred all claims occurring before August 16, 2016, but allowed G.T. to pursue his claim that the school district was continuing to violate his right to a free appropriate public education. (*Id.* at 107). The Hearing Officer reasoned that the data collection problems amounted to "falsifying goal progress data" and was a continuing

9

violation that removed the case from the statute of limitations. (*Id.*).

The hearing was held via Zoom in November 2020. (*Id.* at 109). In April 2021, following post-hearing briefing, the Hearing Officer issued his Findings of Fact, Conclusions of Law, and Final Order. (*Id.* at 242-72). The Order concluded that: (1) the time allocation between general education settings and special education settings was appropriate, and G.T. failed to prove that his IEP was deficient in this area; (2) using an unlicensed and unqualified paraeducator violated the IEP, but no harm resulted; (3) the school failed to implement the Edmark reading program in a timely way, but no harm resulted; (4) there were errors in the school's data collection, but no harm resulted; and (5) the school failed to monitor G.T.'s use of his iPad in the spring of 2019, and as a result there were twenty-two days when he received no meaningful education, but the school could account for those days by offering G.T. compensatory education time. (*Id.* at 253-64).

G.T. appealed the Hearing Officer's Final Order to the Exceptional Children's Appeal Board (the Board) in May 2021. (*Id.* at 281). After briefing, the Board issued its Final Decision and Order in September 2021. (*Id.* at 345-69). The Board reached the same conclusions as the Hearing Officer on all issues. (*Id.*). G.T. appealed to this Court, seeking reversal of the Board's decision, an order that the Campbell County School District pay for G.T. to

10

be educated at a private school, a new trial, and attorney's fees. (Doc. 1 at 9-10).

## *Analysis*

### A. The IDEA and Standard of Review

The Individuals with Disabilities Education Act (IDEA or the Act) provides federal funding to states to help educate disabled children. 20 U.S.C. § 1400. In exchange for the funding, the state must provide disabled children with a "free appropriate public education," or FAPE. § 1412(a)(1). Part of that requirement includes educating the child according to his or her "individualized education program," or IEP. § 1401(9)(D). "The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Endrew v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

The Act provides procedural safeguards for parents who suspect that a school is denying their child a FAPE. The parents may request a due process hearing before an impartial hearing officer. 20 U.S.C. § 1415(f)(3)(A)(i). Any party may appeal the results of that hearing to the state education agency. § 1415(g)(1). Lastly, any party who disagrees with the state education agency's decision may sue in federal district court. § 1415(i)(2).

When reviewing an IDEA case, the district court first asks whether the school district has complied with the procedures of the Act, then asks whether the student's IEP is reasonably calculated to allow the student to receive educational benefits. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982)). The court must receive the records of the administrative proceedings, hear any additional evidence that a party requests, and, based on the preponderance of the evidence, grant appropriate relief. 20 U.S.C. § 1415(i)(2)(C).

The court applies a modified de novo standard: it reviews the evidence independently while giving "due weight" to determinations made during the administrative process. *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (citing *Rowley*, 458 U.S. at 206). The amount of due weight varies depending on whether the administrative findings are based on educational expertise. *N.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 614-15 (quoting *Deal*, 392 F.3d at 849). The court may neither adopt the administrative findings without further review, *Deal*, 392 F.3d at 849 (quoting *Doe ex rel. Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998)), nor substitute its own judgment for that of the school authorities. *Id.* (quoting *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990)).

Thus, the court may set aside the administrative findings "only if the evidence . . . is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Boone Cnty.*, 763 F.3d at 614 (internal quotation marks omitted). The burden of proof lies with the party challenging the administrative proceedings. *Schaffer v. Weast*, 546 U.S. 49, 57–58, 62 (2005).

### B. Alleged Violations

#### i. *IEP Design*

Plaintiffs allege that G.T.'s IEP was not reasonably calculated to provide educational benefits because it was not properly developed. They claim that G.T. was denied a free appropriate public education because the IEP did not provide an education in the "least restrictive environment," as required by the IDEA. 20 U.S.C. § 1412(a)(5)(A).

Specifically, Plaintiffs argue that G.T. did not spend enough time in a general education setting because the school did not provide him with adequate support; that G.T. enjoyed spending time with non-disabled peers; and that the school district was required to prove that time spent in general classrooms provided no benefit, but failed to do so. The Court takes each point in turn.

First, an IEP must be reasonably calculated to provide educational benefits, meaning it must allow the child to make

13

academic progress that is appropriate given his circumstances. *Endrew*, 137 S. Ct. at 999. For a child who is fully integrated in the regular classroom, that means advancing from grade to grade through the regular curriculum. *Id.* (quoting *Rowley*, 458 U.S. at 203-04). But for a child like G.T., who was not fully integrated in the regular classroom and not advancing through the grade-to-grade curriculum (G.T. repeated fifth grade at his parents' request), the IEP need only be "appropriately ambitious in light of his circumstances[.]" *Id.*

The Hearing Officer and Appeals Board found that G.T.'s IEP struck a proper balance between general and special education settings given his circumstances. Plaintiffs can prevail "only if the evidence . . . is more likely than not to preclude the administrative decision from being justified[.]" *Boone Cnty.*, 763 F.3d at 614. But on this point Plaintiffs have no evidence, only speculation. They claim that because the school district never provided G.T. with proper accommodations, whether G.T. could have handled the regular classroom remains "unanswered" and "unknown." (Doc. 22 at 14). But the possibility that G.T.'s outcome might have been different does not mean that his IEP as written was not reasonably calculated to provide educational benefits.

Moreover, the evidence that is available rebuts Plaintiffs' argument. They conjecture that G.T. was unable to mainstream into the regular classroom because the school did not provide a

14

behavioral intervention plan. But the data indicated that 83% of the time G.T. had no behavioral issues, and that his inability to adapt to the regular classroom, even with accommodations, stemmed not from behavior issues, but from the noise and distractions of the classroom and G.T.'s inability to understand instructions. Thus, there is no evidence to support Plaintiffs' claim that G.T. could have mainstreamed into the regular classroom had only the school offered the necessary support.

Next, a student's or parent's preferences for time spent in a regular versus a special classroom has no bearing on an IEP. Plaintiffs claim that G.T. enjoyed being around non-disabled peers and sitting with his sister and her friends during lunch. Presumably Plaintiffs infer from this that an environment with non-disabled students would have been a proper setting for G.T. But Plaintiffs cite no support for their contention that a child's preferences should influence an IEP's terms. The IEP need only be reasonably calculated to provide an educational benefit, a requirement that both the Hearing Officer and Appeals Board found was satisfied.

Finally, Plaintiffs rely on *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983), to claim that Defendants were required to prove that time spent in the general education environment provided no benefit. But their reliance on *Roncker* is misplaced. *Roncker* stated that mainstreaming is not required in

15

every case but should be provided to the maximum extent possible. *Id.* If education in a special classroom (the *Roncker* court used the term "segregated facility") is superior to the regular classroom, the court should ask whether the services that make the special classroom superior could be feasibly provided in the regular classroom. *Id.* In other words, the real question "is whether a proposed placement is appropriate under the Act." *Id.*

The placement here was appropriate. The Hearing Officer and Appeals Board found that the IEP provided education in a general setting to the maximum extent that G.T. could handle. G.T. required customized instruction tailored to his needs. The special classroom was more conducive to providing that instruction than was the regular classroom. And the services that made it so—particularly the lack of noise and distractions—could not be feasibly provided in the regular classroom.

*ii. IEP Implementation*

Plaintiffs next allege that G.T.'s IEP was improperly implemented. They point to four violations: (1) the school used an unlicensed paraeducator; (2) the school did not timely implement the Edmark reading program; (3) the school did not properly collect data on G.T.'s academic progress; and (4) the school did not supervise G.T.'s use of his iPad.

First, Plaintiffs argue that school personnel involved in the IEP were required to be appropriately licensed or certified within

16

the professional discipline in which they provided special education services. They claim the school violated that requirement by using an unlicensed paraeducator. G.T.'s IEP did require that he be accompanied by a special education teacher, not a paraeducator, when in the general classroom.

But the Hearing Officer and Appeals Board concluded that no harm occurred from the school using the unlicensed paraeducator. The paraeducator, while unlicensed, received training from the school, had ten years of experience working as a paraeducator for disabled children, and worked with G.T. every school day for four straight years. There is no evidence that she adapted G.T.'s schoolwork differently from how his special education teacher would have adapted it, or that her adaptations were deficient. Thus, there is no evidence to preclude the administrative decisions from being justified. *Boone Cnty.*, 763 F.3d at 614.

Second, Plaintiffs argue that G.T.'s IEP was improperly implemented because the school failed to administer the Edmark reading program in a timely way. They point to G.T.'s success with the program once it was implemented as evidence that, had it been offered earlier, G.T.'s reading skills would be further along.

But failing to offer the program did not violate the IEP. The school district was required to "make a good faith effort to assist the child in achieving the goals, objectives, or benchmarks listed in the IEP." 707 Ky. Admin Regs. 1:320 Section 9(1). G.T.'s IEP

17

did not mandate or even mention the Edmark program. Moreover, even if the Edmark program did lead to better results than the reading program G.T. was using, an IEP does not have to "maximize" a child's potential: " . . . to require . . . the furnishing of every special service necessary to maximize each handicapped child's potential is, we think, further than Congress intended to go." *Rowley*, 458 U.S. at 199. An IEP does not have to be ideal, it only has to be reasonable. *Endrew*, 137 S. Ct. at 999. And the Sixth Circuit has held that the IDEA does not grant a right to any specific program or methodology. *Tucker ex rel. Tucker v. Calloway Cnty. Bd. of Educ.*, 136 F.3d 495, 504, 506 (6th Cir. 1998). There is no evidence that G.T.'s reading program before Edmark offered no educational benefit. Thus, the Hearing Officer and Appeals Board concluded that any harm to G.T.'s education was *de minimis*. The Court cannot disturb that finding.

Third, Plaintiffs argue that G.T.'s IEP was improperly implemented because the school failed to properly collect data about his academic progress. They claim that data was collected sporadically or not at all, and that without reliable data, it was impossible to track G.T.'s progress or determine whether he was meeting the IEP goals.

The school district offered a simple explanation for the data discrepancies: teachers are busy, and they do not always have time to enter the data they collect into the progress report program.

18

Sometimes they enter the data all at once, when they have time, like during Spring Break when the students are not at school. Moreover, the program they use defaults to the date the data is entered, rather than the date the data was collected. Teachers must manually change the date, which they sometimes forget to do.

The Hearing Officer and Appeals Board both concluded that the data discrepancies did not amount to any educational harm. While the data may not always have been collected and entered simultaneously, the data *was* collected, and could be utilized to show trends over time, which is the very purpose of data collection under an IEP. Plaintiffs have not demonstrated ample evidence to preclude the administrative findings from being justified. *Boone Cnty.*, 763 F.3d at 614.

Lastly, Plaintiffs argue that, for twenty-two days in 2019, G.T. was denied a free appropriate public education because the school failed to monitor and curb his excessive iPad use during school hours. On this point, the Hearing Officer and Appeals Board agreed with Plaintiffs. The Hearing Officer awarded and the Appeals Board affirmed twenty-two days of compensatory education. However, G.T. did not utilize the compensatory education days because his parents withdrew him from the school district.

Therefore, for the reasons stated above, **IT IS ORDERED** that:

1. Plaintiff's Motion for Judgment on the Record, (Doc. 22), be, and is hereby **DENIED.**

2. Defendant's Motion for Judgment on the Administrative Record, (Doc. 27), be, and is hereby **GRANTED**. A separate judgment shall enter concurrently herewith.

This 5th day of October 2022.



Signed By:
*William O. Bertelsman* WOB
United States District Judge